[No. B054132. Second Dist., Div. Three. Aug. 6, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
SEILONI NGAUE et al., Defendants and Appellants.

898

**COUNSEL**

Barbara Springer Perry and Thomas T. Ono, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, William T. Harter and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KLEIN. P. J.**—Defendants and appellants Seiloni Ngaue (Ngaue) and Joanna Kay Smith (Smith) appeal from their respective judgments of conviction following a jury trial. Ngaue and Smith were convicted of second degree robbery as charged in counts I and III of an amended information and of attempted second degree robbery (count II). Ngaue also was found guilty of attempted murder (count IV).[1] The jury found to be true the firearm allegation as to counts I through III, the infliction of great bodily injury allegations as to counts I and IV, and the personal use allegation as to each count. The trial court found to be true the allegations Ngaue had suffered two prior serious felony convictions.

On appeal Ngaue and Smith assign as error the trial court's denial of their renewed motion to suppress evidence under Penal Code section 1538.5.[2] Smith also attacks the sufficiency of the evidence to support the judgment against her on the theory she was an aider and abettor in the charged robbery and attempted robbery offenses.

---

[1] In a prior trial the jury acquitted Smith of the attempted murder charge in count V. We note the verdict inadvertently referred to the count as IV instead of V.

[2] All further section references are to the Penal Code.

The trial court correctly denied Ngaue and Smith's motion to suppress evidence in that reentry of the house to retrieve the gun was justified on the ground of exigent circumstances. Further, there was ample evidence to establish Smith as an aider and abettor. We therefore affirm the respective judgments against Ngaue and Smith.

Because the abstract of judgment as to Ngaue contains two clerical errors,[3] the clerk of the superior court is directed to correct the abstract of judgment as to Ngaue by striking the reference to section 667.7, subdivision (a), as to the one-year enhancement and substituting therefor section 667.5, subdivision (b), and by striking the reference to count I and substituting therefor count IV with regard to the section 12022.7 enhancement.

## PROCEDURAL BACKGROUND

Ngaue and Smith were charged with robbery (§ 211) in counts I and III of an amended information. They were charged with attempted robbery (§§ 664/211) in count II. In counts IV and V, respectively, Ngaue and Smith were charged with attempted murder (§§ 664/187, subd. (a)).

As to each count it was alleged a principal in the offense was armed with a firearm (§ 12022, subd. (a)). It was also alleged Ngaue personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5) in committing the offenses in counts I through IV; and as to counts I and IV, he personally inflicted great bodily injury (§ 12022.7). The above offenses and allegations were further alleged to be serious felonies (§ 1192.7, subd. (c)(8)).

In an amendment to the information it was alleged Ngaue had served more than two prior separate prison terms (§ 667.7, subd. (a)). In an additional amendment it was alleged Ngaue had suffered two prior serious felony convictions (§ 667, subd. (a)).

Following a hearing, Ngaue and Smith's motion under section 1538.5 was denied.

The original trial resulted in a mistrial. The second trial also resulted in a mistrial as to all counts except count V. As for count V, the jury found Smith not guilty of attempted murder.

---

[3]The People assert the abstract of judgment as to Ngaue contains two clerical errors. Based on our review of the record we agree. The abstract of judgment incorrectly reflects the one-year prior conviction enhancement was imposed pursuant to section 667.7, subdivision (a). It was imposed pursuant to section 667.5, subdivision (b). Also, the abstract of judgment mistakenly reflects the enhancement for infliction of great bodily injury under section 12022.7 pertains to count I. The enhancement instead had to have been imposed as to count IV.

Ngaue and Smith's renewed motion under section 1538.5 was denied.

At the conclusion of the third trial the jury found Ngaue and Smith guilty of second degree robbery as charged in counts I and III and of attempted second degree robbery as charged in count II. The firearm allegation was found to be true as to each count.

The jury also found Ngaue guilty of attempted murder as charged in count IV and further found to be true the personal use allegation as to each count and the infliction of great bodily injury allegations as to counts I and IV.

At the prosecutor's request one prior conviction allegation was amended to fall under section 667.5, subdivision (b), instead of section 667, subdivision (a). The trial court found the prior conviction allegations to be true.[4]

### FACTUAL BACKGROUND

At trial the following evidence was presented:

Sometime late night October 7, or early October 8, 1989, at the gas station on the corner of Freeman and Century, Smith signaled to Guillermo Navarro (Navarro) who was driving by to stop. When Navarro stopped, Smith approached and offered "a little suck." Navarro said: " 'I don't need it. I don't need it, maybe Ramon or my cousin.' " Ramon Guerrero (Guerrero) was in the front passenger seat while Jose Castellanos (Castellanos), Navarro's cousin, was in the backseat.

Smith invited them to her house. After driving to her home at 4228 West 102d Street in Inglewood, they declined her invitation to enter. Instead, they circled the block and stopped the car across the street from the house Smith entered.

Smith exited the house, accompanied by Ngaue, who also lived there. While Smith, who stood about three feet away from the car, talked with Guerrero, Ngaue approached Navarro with pistol in hand. Ngaue opened the driver's door, placed a foot inside and asked for money with his hand on the pistol. When Navarro told him he had no money, Ngaue turned to Guerrero and Castellanos.

When asked, Guerrero gave Ngaue money. Castellanos was unable to comply right away with Ngaue's demand for money because he was frightened by the gun, which was pointed close to his head. Ngaue, who was about

---

[4]We note the clerk's transcript erroneously indicates Ngaue admitted the two prior conviction allegations.

a foot away, fired one shot and then fired a second shot, which wounded Castellanos in his side. Castellanos handed Ngaue his wallet prior to the second shot.

Driving away, Navarro saw Ngaue and Smith look at the wallet as Ngaue held it. Castellanos saw Ngaue and Smith walk to the house together.

Castellanos was treated at a hospital for two gunshot wounds to his left back area and suffered pain from his injuries for about a month.

Ngaue and Smith relied on a defense of mistaken identity. Ngaue showed his arms to the jury. Ngaue's attorney argued the victims reported seeing no tatoos. Smith's attorney argued the victims reported to the police a black man, "not a man from the islands," such as Ngaue, was the assailant. He further argued there was insufficient evidence to show Smith did anything to aid or abet the charged robbery and attempted robbery offenses.

### SECTION 1538.5 FACTUAL AND PROCEDURAL STATEMENT

Ngaue and Smith made a motion to suppress the gun pursuant to section 1538.5 and the following evidence was adduced: On October 8, 1989, while on patrol, Los Angeles County Deputy Sheriff Halpin saw Ngaue standing directly before 4228 102d Street, a single-family residence. He recognized Ngaue as an attempted murder suspect. Ngaue ran up the driveway and into a side door.

Halpin and his partner, Deputy Tenney, followed but entered slowly for safety reasons since the doorway had a curtain across it and it was dark inside.

Immediately, they were confronted by Smith, who was extremely abusive verbally and said no one was there. The deputies caused Smith to exit in order for their search to proceed safely.

The deputies heard the sound of a heavy metal object fall to the ground in the bathroom. Halpin recognized the sound to be that of a weapon. After opening the door, the deputies saw Ngaue seated on the toilet. While outside they asked his name. He replied: " 'Seiloni.' " Tenney also saw a gun on the bathroom floor.

After ordering Ngaue to stand up and place his hands on the wall, Halpin stepped just inside the bathroom, patted down Ngaue and handcuffed him with his hands behind his back. Tenney stayed outside. Halpin then caused

Ngaue to exit at which point both deputies grabbed him by each arm and took him away. Halpin felt for officer safety it required both deputies to escort Ngaue.

As the three exited the house, Smith, who was near the threshold by the curtain door, approached and was verbally abusive, telling them they had the wrong person. Following them down the driveway, Smith again yelled at the deputies.

After placing Ngaue in about the middle of the backseat of the patrol car, Tenney told Halpin he had seen a gun on the bathroom floor. Halpin had not seen the gun earlier and had not looked for it because he feared Ngaue, who is extremely large and appeared then to be rigid, almost hostile.

Halpin was almost at the doorway when he heard Smith yell at Tenney. Tenney gestured at Smith, who was near the car door, and told her to get away from the car. Tenney and Smith got into a scuffle as Tenney tried to take Smith into custody. The deputies each grabbed one of Smith's arms and attempted to secure her but she resisted by pulling around and twisting. At one point she grabbed behind Halpin and held part of his shirt and belt. While he tried to pull her hand away, she shouted: " 'Go, Seiloni, go.' "

Halpin saw Ngaue move his handcuffs in front of him, jump over the backseat, open the right passenger door, exit the car and run eastbound on 102d Street.

Halpin pursued Ngaue on foot. Subsequently, he called for assistance. About 15-20 minutes after Ngaue's escape the area was secured and Halpin believed there were enough officers present to ensure Ngaue's capture. At that point Halpin radioed Deputy Garay, who was in a roving unit, and instructed him to go back and secure the weapon and to detain or arrest Smith. No telephonic search warrant was obtained.

Halpin did not ask officers to secure the house earlier because his primary concern was containment of the suspect. When Halpin originally entered the house, he had noticed two men who, like Ngaue, appeared to be Samoan or Tongan standing 10-12 feet from the house between the house and the garage behind it. Inside the house he did not notice anyone other than Ngaue and Smith, but he did not check to see if anyone else was there.

About three to three and one-half hours after escaping, Ngaue was captured.

The prosecutor argued reentry to retrieve the gun was merely a continuation of the original entry in hot pursuit of Ngaue, and thus, sanctioned under *People* v. *McDowell* (1988) 46 Cal.3d 551 [250 Cal.Rptr. 530, 758 P.2d 1060].

The trial court denied the motion.

## ISSUES PRESENTED

Ngaue and Smith jointly assign as error the trial court's denial of their renewed motion under section 1538.5 to suppress evidence of the gun. Smith further challenges the sufficiency of the evidence to establish her culpability as an aider and abettor in the robbery and attempted robbery charges.

Based on our review of the record and applicable law we find the trial court properly denied the 1538.5 motion and there was ample evidence to support the implied finding Smith was an aider and abettor in the robbery and attempted robbery offenses.

## DISCUSSION

1. *Denial of renewed section 1538.5 motion proper.*[5]

■■■ Defendants urge their motions to suppress evidence under section 1538.5 should have been granted because the warrantless seizure of the gun was unlawful. They acknowledge seizure of the gun in plain sight without a warrant is lawful where exigent circumstances exist, e.g., hot pursuit, immediate threat of removal or destruction of evidence, or difficulty in obtaining a search warrant readily. (See, e.g., *Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642] ["hot pursuit" of fleeing suspect]; *Chimel* v. *California* (1969) 395 U.S. 752, 755-768 [23 L.Ed.2d 685, 689-697, 89 S.Ct. 2034] [search of arrest suspect and area within his sphere for weapons or evidence]; *Schmerber* v. *California* (1966) 384 U.S. 757, 770-771 [16 L.Ed.2d 908, 919-920, 86 S.Ct. 1826] [imminent destruction of evidence]; cf. *Mincey* v. *Arizona* (1978) 437 U.S. 385, 393-395 [57 L.Ed.2d 290, 300-302, 98 S.Ct. 2408].) However, they contend no such circumstances were established in this case.

Although conceding the initial entry of the house in hot pursuit of Ngaue by the deputies was authorized, Ngaue and Smith deny reentry of the house to seize the gun was warranted. They argue reentry cannot be justified on a theory of hot pursuit because there was no evidence the officers believed Ngaue might have returned and was hiding in the house. They further argue no evidence of any other exigency justifying reentry was offered, e.g., fear

---

[5]In his brief at footnote 6 on page 12, the Attorney General claims defendants have failed to present a record adequate to address their claim of error since there were a total of three suppression motions and the record on appeal only includes the transcript of the third. The Attorney General, however, abandons this argument in view of our determination the trial court correctly denied the third suppression motion.

for officer safety unless the gun were seized or fear the gun would be lost if not seized.

Also, Ngaue asserts there was no evidence to explain why an officer was not assigned to secure the residence until a warrant could be obtained or why Halpin failed to seek a telephonic warrant through his hand-held radio.

Both Ngaue and Smith acknowledge reentry to seize items in plain view during the initial lawful search is sanctioned under certain circumstances as enunciated in *McDowell*. However, they deny such circumstances exist in this case. Ngaue points out in contrast to *McDowell* the house here was not secured after the initial departure and no officer was instructed to make sure no one entered the house. He contends absent these facts the requisite uninterrupted police presence at the house was not established. (See *McDowell*, *supra*, 46 Cal.3d at p. 564.)

Ngaue also contends there was no reason to believe the gun was still in the house when the reentry was made since Halpin did not know if anyone was in the house, or if other people, including Smith, were in the vicinity when he left. He claims anyone could have had access to the house through the side entrance where only a curtain covered the doorway.

Smith further distinguishes *McDowell* on the ground Deputy Garay had never seen the gun prior to seizing it and Tenney, the officer who actually saw the gun in plain view, did not return to supervise its seizure.

■ Ngaue and Smith's position is meritless. "The constitutionality of a particular search is always a question of reasonableness and depends on a balance between the public interest in the arrest and apprehension of criminals and the individual's right to personal security free from arbitrary interference by law officers. [Citations.]" (*People* v. *Amaya* (1979) 93 Cal.App.3d 424, 430 [155 Cal.Rptr. 783].)

a. *Officer safety justified reentry of dwelling to retrieve the gun.*

■ We conclude reentry to retrieve the gun was justified for officer safety. The record establishes during the 15-20 minutes it took to contain the area following Ngaue's escape, there was no opportunity for the deputies to secure the residence. Further, until the gun was retrieved the deputies were at risk.

Ngaue remained at large and his whereabouts were unknown for about three and a half hours after his escape. Ngaue therefore could have returned and picked up the gun himself.

It is undisputed no sweep of the residence was made prior to Ngaue's arrest, and thus, there may have been others in the house who might have had immediate access to the gun. Also, Smith, who was not in custody at the time of Ngaue's escape, or one of the two men in the vicinity, could have picked up the gun.

> b. *Reentry of dwelling to retrieve the gun also authorized under McDowell.*

■ We find no cognizable distinction in this case between retrieval of the gun immediately upon Ngaue's arrest, which defendants concede would have been lawful, and reentry to retrieve the gun after Ngaue's escape, since there was no intent on the part of the officers to abandon the gun and retrieval of the gun took place without inexcusable delay.

Reentry to retrieve the gun, even absent the exigent circumstances of officer safety, is justified under *McDowell*. The fact the house was not secured prior to reentry is insignificant. The *McDowell* court did refer to the securing of the house prior to reentry as showing " 'an uninterrupted police presence in [the residence] . . . .' [Citation.]" (*McDowell, supra*, 46 Cal.3d at p. 564.) However, the purpose of those references was not to identify these facts as critical factors. Rather, they were merely recited as evidencing the officer's intent not to "relinquish[ ] his right to seize [the evidence in plain view in the initial entry] by giving more immediate priority to defendant's arrest." (*Ibid.*)

The crux of the *McDowell* case, instead, is the lack of intent by the officer to abandon the items in plain view and his inability to seize them immediately because of the necessity to continue the hot pursuit, i.e., "[i]n sum, defendant was still at large, the surrounding area had been sealed off, and [the officer] was in hot pursuit. Under the circumstances, the search [upon reentry] was reasonable." (*McDowell, supra*, 46 Cal.3d at p. 564.)

Here, there was no inexcusable delay between the time the gun was initially perceived and the time it was retrieved, nor was there evidence of any intent on the part of the deputies to abandon the gun. To the contrary, the evidence established but for exigent circumstances, i.e., officer safety, the deputies would have retrieved the gun immediately upon Ngaue's arrest or upon depositing Ngaue in the patrol car.

Also, there was no subsequent opportunity for retrieval of the gun until the area was contained to enable Ngaue's recapture. It was right after this occurred that Halpin radioed Garay to pick up the gun, which he did.

c. *Retrieval of the gun by officer with no percipient knowledge warranted where information about the gun was obtained through official channels.*

We further find to be a distinction without a difference the fact the gun was retrieved by Garay, who had no firsthand knowledge of the gun, rather than Tenney, who saw the gun in the first instance. Garay's lack of personal knowledge of the gun is irrelevant. He received a radio call from a fellow officer instructing him to retrieve a gun at a certain location. Garay was entitled to rely on that information, which he had received through "official channels." (*People* v. *Lara* (1967) 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202]; see also, *People* v. *Galosco* (1978) 85 Cal.App.3d 456, 461 [149 Cal.Rptr. 407] [upheld probable cause to arrest based on radio dispatch of a " 'possible 459,' i.e., a possible burglary"].)

Moreover, the record establishes the information was in fact reliable. Halpin, who told Garay to get the gun, had personal knowledge of the gun's presence in the bathroom because he heard it fall to the bathroom floor. (See, e.g., *People* v. *Stamper* (1980) 106 Cal.App.3d 301, 305-306 [164 Cal.Rptr. 861] [upheld warrantless search based on officer hearing sound of a round being slid into firing chamber of a shotgun or rifle].) His knowledge was then corroborated by Tenney's statement he saw the gun in the bathroom.

Based on the foregoing we conclude the trial court correctly denied the renewed motion to suppress evidence.

2. *Ample evidence supports judgment on aider and abettor theory.*

■    Smith also challenges the sufficiency of the evidence to sustain her conviction of the robbery and attempted robbery charges on the theory she was an aider and abettor of Ngaue. She contends "the evidence established nothing more than [Smith's] mere presence at the scene of the robberies."

We reject Smith's argument as contradicted by the record, which contains ample evidence to establish her culpability as an aider and abettor. From this evidence the jury was entitled to find Smith not only facilitated or encouraged the subject offenses but that she was an active participant in those offenses. (See, e.g., *People* v. *Cooper* (1991) 53 Cal.3d 1158, 1160 [282 Cal.Rptr. 450, 811 P.2d 742].)

Smith set the scenario for the robbery and attempted robbery offenses by luring the victims to her house with the offer of sex. She went into the house and came back with Ngaue, who lived there. She also talked with Guerrero

to distract him while Ngaue approached Navarro with a gun. Moreover, Smith acted as a lookout by standing nearby during the robberies and attempted robbery of the victims by Ngaue. Finally, the jury was entitled to infer Smith had expected to share the loot since she also looked at the contents of Navarro's wallet, and she and Ngaue walked back to the house together.

## DISPOSITION

The respective judgments against Ngaue and Smith are affirmed. The clerk of the superior court is directed to correct the abstract of judgment as to Ngaue by striking the reference to section 667.7, subdivision (a), as to the one-year enhancement and substituting therefor section 667.5, subdivision (b), and by striking the reference to count I and substituting therefor count IV with regard to the section 12022.7 enhancement.

Croskey, J., and Hinz, J., concurred.

A petition for a rehearing was denied September 8, 1992, and appellants' petition for review by the Supreme Court was denied November 12, 1992.