Filed 10/22/25  P. v. Sibilio CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULES LOUIS SIBILIO,<br><br>    Defendant and Appellant. | A167325<br><br>(San Francisco City & County<br>Super. Ct. No. CRI14022755) |

Defendant Jules Louis Sibilio appeals from a judgment of conviction for the second degree murder of his long-time girlfriend, Mary Aileen Atchison, in their San Francisco apartment, for which he was sentenced to a prison term of 15 years to life.

Sibilio called emergency services to the apartment, purportedly upon finding Atchison lying on the floor of their bedroom dead when he woke up one morning.  Evidence from the autopsy revealed 57 blunt force injuries on different places all over her body, including injuries to the head that caused fatal subdural hemorrhaging.  The wrecked condition of the apartment's living room and injuries to Sibilio suggested a pre-death physical struggle, and there was testimony from friends, family, and neighbors that Sibilio had abused Atchison for years.  At trial, Sibilio admitted to his history of abusing

1

Atchison and said they drank heavily and physically fought the night of her death, but he denied murdering her.

Sibilio contends we must reverse because of the trial court's insufficient response to a jury question about implied malice, a lack of substantial evidence that he murdered Atchison, and the trial court's erroneous denial of his motion to suppress certain evidence obtained in violation of his constitutional rights against unreasonable searches and seizures. We see no grounds for reversal and affirm.

## I. BACKGROUND

In November 2022, the San Francisco District Attorney filed a first amended information charging Sibilio with Atchison's murder (Pen. Code,[1] § 187) on August 26, 2014, and alleging five aggravating factors (Cal. Rules of Court, rule 4.421). A jury trial followed.

### A. *The Prosecution's Case*

#### 1. **Testimony of Jerome Vail**

Jerome Vail, who, with his wife, was Sibilio's landlord, testified that Sibilio and Atchison lived on the second floor of an apartment house with one unit each on the second and third floors and a two-car garage on the first floor (apartment house). Between 9:10 a.m. and 9:20 a.m. on the morning of August 26, 2014,[2] he was at the apartment house with workers to install new garage doors when Sibilio ran to him in an agitated and disheveled state, with his hair wildly out of place and his eyes red.

Sibilio said very excitedly to call 911 and indicated Atchison was not breathing. Vail dialed 911 and gave his phone to Sibilio, who took it and ran

---

[1] Undesignated statutory references are to the Penal Code.

[2] We summarize testimony of events occurring on August 26, 2014, unless otherwise indicated.

back upstairs.  Vail then went up to Sibilio's apartment, where he found a living room bookcase overturned and the living room floor covered with various things.  Vail saw Sibilio administering CPR to Atchison, who was lying face up on the bedroom floor, and pumping her chest while on the phone to a dispatcher, crying and talking to himself.

### 2.  Testimony of Paramedic Greg Stangland

Greg Stangland, a San Francisco Fire Department paramedic, testified that he was dispatched to the apartment house at about 9:30 a.m.  Sibilio, looking a little disheveled, answered the door and let Stangland into his apartment.  He directed Stangland to the bedroom, but did not give him much information.  Sibilio had dried blood on his shirt, a cut on his forehead, and some minor scrapes on his face.  The inside of the apartment looked like a "tornado" had hit it.  Books and things were strewn about the living room as if "some sort of violent incident had occurred," as were several empty alcohol containers.

Stangland found Atchison in the bedroom, lying face up between the bed and a window, her body pulseless and cold to the touch.[3]  Stangland thought she had been lifeless or in bad shape for up to three hours because blood was starting to pool on her back, legs, and arms, her abdomen appeared bruised due to lack of blood flow, and her jaw was stiff.

Upon repeated questioning, Sibilio said he and Atchison had been drinking heavily the night before and had fought, that he had last seen her alive around 11:00 p.m., and that he later found her lying face down on the floor.  At the preliminary hearing, Stangland testified that Sibilio also said Atchison had punched and scratched him.  Unable to get straight answers from Sibilio and suspecting foul play, Stangland requested police.

---

[3] The paramedics pronounced her dead at 9:33 a.m.

### 3. Testimony of Lieutenant Lisa Springer

Lieutenant Lisa Springer of the San Francisco Police Department testified that she responded to a fire department alert about a suspicious death and arrived at the apartment house at around 9:50 a.m. She was the first police officer to arrive at the scene. When she entered the apartment, she saw Sibilio standing in the living room, appearing distraught. His nose and forehead appeared to be injured and his t-shirt had some red material on it. The living room was in disarray. Bookshelves were knocked over, a coffee table was on its side, glass was on the floor, and papers were strewn about. She detained Sibilio and put him in the back of her patrol car.

### 4. Other Evidence from the Apartment House

A retired police crime scene investigator testified that he saw the flat screen television in the living room had two areas "of what appear[ed] to be an impact point . . . that had damaged the screen."

Upon subsequent testing, blood on an orange shirt that was lying by a living room couch and apparent blood on the living room walls, floor, and ceiling were found to contain Sibilio's DNA. Blood on a pillowcase lying near Atchison's body and on a hand towel in the bathroom hamper contained both Atchison's and Sibilio's DNA. Blood stains from the edge of the bathtub and blood on a towel taken from the bedroom floor by Atchison's head, a pillow found close to her body, and a hand towel contained Atchison's DNA. Items, such as a shirt, towels, and sheets, found in a dusty trash bag in the garage, some of which bore a Holiday Inn label, contained Atchison's DNA.[4]

---

[4] There was also blood or apparent blood found on a sock near Atchison's body, a paper bag, a gel pack, and the bathroom sink, but its source or sources were not identified at trial.

4

### 5. Testimony of Dr. Amy Hart

Dr. Amy Hart, a medical examiner with the San Francisco Office of the Chief Medical Examiner, testified that she and two medical examiner investigators arrived at the apartment about 11:09 a.m. The investigators measured the bedroom's ambient temperature as 75.5 degrees and Atchison's body's armpit temperature as 86.7 degrees. This was consistent with Atchison dying within the last day, probably closer to the time she was found than to 24 hours before.

Dr. Hart, designated a prosecution expert in forensic pathology, testified about the results of an autopsy she performed on Atchison's body. She found 57 blunt force injuries to the head, neck, torso, and extremities that appeared to have occurred at or within a day of death. She confirmed this for 15 of the injuries upon examining microscopic sections of them.

More specifically, Dr. Hart found three injuries on the back of Atchison's head, one on the left side and two on the right side, all involving bleeding into the scalp, which would have occurred when Atchison's heart was beating. She did not find any skull fractures. A large volume of blood, 120 milliliters, was in a subdural space on the right side of the brain that normally did not contain blood, consistent with bleeding from trauma. It was the kind of injury "associated with loss of consciousness," and could have occurred from one or multiple impacts. It also could have led to the potentially fatal "Duret's syndrome"—the additional bleeding in the brainstem area, which controls such things as the beating of the heart and breathing.

Dr. Hart also found bruises on the left side of Atchison's chin, on the upper part of the neck, on the right and left sides of the forehead, and around the left temple; some redness, hemorrhaging, and tearing of the skin on the inside of the upper lip; and some bruising on the right side of the lip and the

5

tongue. Atchison likely inhaled blood found in the lungs from the tear in her lip. There were bruises on Atchison's right shoulder and breast, the other side of the left breast, the upper left side of the back, the right side of the back, the back of the right hand, the right thumb, the back of the left hand, the back of both thighs, the front of the right thigh (which was also abraded), both knees, the top and back of the left foot, and the back of the heel, and an abrasion on the back of the left thigh. Dr. Hart observed lividity—the pooling of blood—on Atchison's back, indicating the body laid face up after death.[5]

Also, Atchison had hepatic cirrhosis of the liver. Such a condition might or might not make it more likely for a person to bleed more than a person with a healthy liver. Dr. Hart did not see any evidence that Atchison bruised more easily than others.

The concentration of ethyl alcohol was determined to be .15 in Atchison's femoral blood and .19 in the vitreous humor; blood from the subdural hemorrhage, indicative of what was in her system at the time of hemorrhaging, was tested and did not have alcohol in it. The absence of alcohol would indicate Atchison consumed some after sustaining the subdural hematoma.

Dr. Hart opined that "[t]he multiple blunt force injuries which [Atchison] sustained which resulted in the bleeding . . . and the internal hemorrhaging in the brain are what caused her death." She could not say how long it took for Atchison to die, but it could have occurred within

---

[5] Dr. Hart also found "rare petechia hemorrhage" and "bleeding or confluent hemorrhages" in the white part of both eyes, which could occur from the compression of blood vessels of the neck or chest, violent retching or vomiting, or heart attacks. There was no evidence of the neck being grabbed or compressed or of force being applied to the eyes. Also, there was a mark on the abdomen that was probably just an impression on the skin that occurred after death.

"minutes to hours" from Duret's Syndrome. Her death was a homicide, which Dr. Hart listed as the cause of death on the death certificate, because "[t]he numbers of injuries in different planes happening at or around the time of her death resulting in a chain of events in the brain that led to sudden death . . . are consistent with injuries that were caused by the actions of another person."

Dr. Hart rejected the theory (which the defense offered at trial) that Atchison died from a fall because she would expect injuries from a fall to be on a single plane only. A fall onto an irregular surface or irregular objects might impact a body on different planes, but the injuries would still be limited to the side of the body impacted. Also, bruises on Atchison's left armpit and on the left earlobe area were in "areas that are protected" from a fall, and there were no injuries to the nose. A fall could not explain the variety and distribution of Atchison's injuries. Further, injuries on Atchison's hands, including bruises, abrasions, and a broken fingernail, were consistent with her defending herself.

**6. Sibilio's and Atchison's 2014 Voicemails and Text Messages**

The prosecution introduced text messages and voicemails from Atchison to Sibilio in 2014 indicating he repeatedly beat her, including the following excerpts:

February 4 texts: "I am in a lot of fucking pain. You really did a number on me this time. I can't sit. I can't lay. . . . I can't fucking sit down!"; "I feel like my head is going to explode"; and "a coworker commented on my bloody eye . . . ." She also sent a photo showing skin discoloration around her eyes.

A February 25 voicemail indicating she had to wear a long-sleeved shirt in hot New Orleans "because I'm covered in bruises. . . . I had to buy more makeup . . . ."

7

A March 14 text: "Huge bruise on my face from the beating."

A March 21 text: "I cannot manage your abuse. You hurt me in so many ways."

A May 7 text: "You beat me to a bloody pulp and pulled out half of my hair . . . . For no reason . . . ."

A May 22 text: "hat [*sic*] are you doing wrong when you beat me so badly that I have to re [*sic*]."

June 27 texts: "Want me to message Troy and tell him how you beat me? . . . You can hit the fuck out of me all the live long day, and there is nothing that I can do about it because 1) I am weaker than you and 2) you know I will never call the cops on you." Later, she texted that she was afraid of him and asked that he promise not to beat her.

A June 28 voicemail: "Are you ready to beat me up in the stands in front of our fucking seat mates? . . . Ready to do it in front of everybody, not in the privacy of your own home?"

July 15 text: "I am in a lot of pain. I can't see out of my left eye or hear out of my right ear. I have bruised ribs on the front and back of my torso. I have a bruise on my right knee that is eight inches long and covers my calf and thigh. I have a bruise on my neck where you strangled me. My hand is stolen [*sic*] where you hit me with the remote three days ago. . . . So bruised that the bruise goes all the way through my hand to my palm."

A text of August 25—the last date she was seen alive: "I can't do my job when you're constantly yelling at me."

### 7. Evidence of Sibilio's History with Atchison

More than a dozen friends, family, and neighbors of Atchison and Sibilio testified about the couple's history, including that Sibilio and Atchison had tempers, were in a volatile relationship, and could set the other off; on social occasions, they often drank to the point of intoxication and were very

8

heavy drinkers; Atchison had a drinking problem that got worse once she became involved with Sibilio; and Atchison often drank to excess and sometimes became heavily intoxicated. One friend testified that Atchinson could be clumsy, fall, and bump into things when intoxicated. Numerous witnesses testified that Sibilio repeatedly yelled at Atchison and called her profane names.

Numerous witnesses also testified that they saw bruises on Atchison during her time with Sibilio. These included bruises on her arms, neck, right cheek, face, right bicep, and near her mouth. From 2011 to 2014, one friend repeatedly observed bruises on Atchison; in May 2014, Atchinson's cheek bones were puffy and her cheeks bruised; and on ten occasions between 2013 and 2014, her coworker noticed bruises on Atchison's upper shoulder and, in May 2014, a large bruise on Atchison's chin.

During a trip to New York in 2008, a friend saw Sibilio slap Atchison two or three times, hit her at least once with a closed fist, body-slam her, and push her against a closed metal gate; he also acknowledged throwing a remote control at her. Sibilio told the friend he had a problem hitting Atchison, mostly when he was intoxicated.

In 2011, a person walking by Sibilio's and Atchison's apartment heard a man screaming obscenities, a woman yelling, "Ow, ow, ow. You are hurting me," and loud banging. She reported it to 911, and told police in 2014 it had sounded like real violence.

Atchison repeatedly denied that Sibilio physically assaulted her and was protective of him. She told one friend that she felt trapped and unhappy

in the relationship but was worried about her credit card debt, and another friend that she was afraid to go home because Sibilio was mad.[6]

### 8. The Upstairs Neighbor's Testimony

On the evening of August 25, 2014, around 8:00 or 9:00 p.m., the couple's upstairs neighbor heard Sibilio run up the stairs to the couple's apartment and, once inside, say, "[Y]ou fucking bitch." She heard him and Atchison then argue for maybe two hours. At one point, she heard Atchison say, "Ow, ow," and then "Get off me, get off me." At another point, she heard a big thump, like when you bang something on a wall, floor, or ceiling. Things quieted down before 11:00 p.m., when the neighbor went to bed, but she awoke around midnight to a crashing noise and heard another half hour of yelling between the two. The neighbor plugged her ears and went back to sleep; in the morning, she put a domestic violence flyer on Sibilio's truck that police later found there.[7]

## B. *The Defense Case*

### 1. Sibilio's Testimony

Sibilio, about 49 years old in 2014, testified that in 2002 he began dating Atchison, 42 years old in 2014. They had a number of things in common, including drinking. They moved into the apartment house in 2005.

Sibilio said he was an alcoholic and had been very unhappy when he was involved with Atchison. He would always blame her for things and verbally and physically abuse her. He acknowledged some of what other

---

[6] A marriage and family therapist testified for the prosecution about several categories of common abusive behavior, including emotional and physical abuse. He also testified that a victim of domestic violence could stay with an abuser and deny abuse to family and friends for a variety of reasons.

[7] A next-door neighbor heard Sibilio yelling at Atchison for about 30 seconds at some point on the night of August 25. Another neighbor heard nothing unusual that night.

witnesses testified about, such as some of his actions in 2008 in New York, and said that from 2008 until 2014 he engaged in numerous acts of even worse physical violence against Atchison. He punched her "[a] lot," mostly on the arms and back, and slapped her perhaps five times during their relationship; "it really escalated towards the end" when he "was physical with her often." He slapped, but did not punch, her in the face on eight or nine occasions, usually only once. He threw things at her perhaps six or seven times and punched the wall of their apartment a few times. He did not strangle Atchison and only grabbed her by the throat once, as indicated in one of her 2014 text messages. He denied beating her to a pulp in 2014. He said the bloodied items found in the garage of his apartment house were from a Holiday Inn where Atchison had hurt herself in an accident in 2013.

On August 25, 2014, Sibilio testified, he quarreled with Atchison by phone and text messages about whether one of her coworkers could borrow his cooler. He went to a bar at about 5:00 p.m., leaving his uncharged phone in his truck; as a result, he missed calls from Atchison to him. He was intoxicated when he left at around 9:30 p.m. At the time, he thought he and Atchison had resolved their fight.

When Sibilio got home, Atchison was sitting on a couch drinking beer, upset that he had missed her calls. He told her he did not intentionally ignore her, but she kept yelling at him. He jumped on her and tried to kiss her to lighten the moment. She pushed him off and he started drinking and watching television.

About 30 or 45 minutes later, Atchison brought up the cooler, which irritated Sibilio because he thought they had resolved the matter. He called her profane names, "acting like a child." After a few minutes, their fight escalated when he hit her with a lighter. They began throwing things at each

11

other and he may have yelled. He jumped on her to get her to stop throwing things, and "probably . . . hit her a couple of times" in the arms and back.

Atchison pushed Sibilio away. He came at her again and pushed her backwards towards a couch. They fell over a coffee table and when she stood up he dragged her back down to the floor. He hit her in her back and slapped her as they fought on the floor for 30 seconds to a minute, when Atchison jumped up and went into the kitchen. He returned to the couch. She returned to the living room and they drank and yelled at each other for a time.

Sometime later, they argued about her giving away some of their San Francisco Giants season tickets. When Atchison ignored him, Sibilio threw a beer can against a television, breaking it in a top corner, and then threw an ashtray into it, smashing it. He jumped on Atchison again and "probably slapped her." She pushed him off and got up. He grabbed her by the arms, pulled her to the ground, and hit her again. At some point, she got up and threw an ashtray that hit him on the bridge of his nose. He fell over and hit the entertainment center and a table next to it. He pushed her into a bookcase containing all kinds of things, which "kind of fell" on Atchison, but she got out of the way and things scattered all over the floor. He threw her onto them.

Sibilio stood there, dripping blood onto the floor from a forehead wound caused by the entertainment center and table. Atchison got an orange shirt, an ice pack, and a towel to try to stop Sibilio's bleeding. They laughed together. He went into the bedroom. At some point, she came in with their cat and laid down next him. They petted the cat, apologized to each other, and, Sibilio testified, "laughed at how fucked up I was."

Atchison fell asleep and Sibilio went back into the living room, then returned to the bedroom, where Atchison, still dressed, was sleeping on top of the bed. He passed out and slept through the night, waking up around 9:00 a.m. to the sound of banging from the building's garage. He found Atchison lying face down on the floor between the bed and the window, unresponsive. He rolled her over, found she was not breathing, and gave her mouth-to-mouth resuscitation, which was difficult because she was really stiff. Blood came out of her mouth, which he wiped off with a rag. He could not find his phone and ran downstairs, where he found Vail.

Sibilio talked to a 911 operator and continued performing CPR on Atchison until paramedics arrived. After the paramedics said Atchison was dead and that they were contacting the police, he told them Atchison had hit and scratched him in a fight. He admitted at trial this was a self-serving account.

## 2. Testimony of Dr. Judy Melinek

Dr. Judy Melinek, a forensic pathologist formerly with the Alameda County Coroner, testified as a defense expert in forensic pathology, wound interpretation, and forensic toxicology interpretation. She opined that Atchison died from blunt force trauma to the head with a subdural hemorrhage and brain injury. This could have resulted from someone striking her in the head with a hard object or from a fall. Evidence of lividity on Atchison's abdomen and face indicated her body had been face down and then flipped over. There were also what looked like pressure marks on the left side of the abdomen from the body lying on something.

Dr. Melinek testified that a photograph showed apparent blood on the floor near Atchison's head, which, given the injury to the inner lip, suggested the body had been face down on the floor. Atchison may have suffered this injury and the bruises on her chin and lips from collapsing to the floor, as

13

bloodstains were absent from her shirt where drip marks should have been if she had been upright when she sustained them. Also, several of her facial injuries were on the same plane, consistent with a face-first fall, and she could have hit a nearby nightstand as she fell.

Dr. Melinek said it was possible to sustain multiple bruises on different planes from a single push or fall. A person's arm might go out to try to catch the fall and a person might hit something like a nightstand on the way down, or land on objects on the floor. The injuries to Atchison's lips, the small pooling of blood by the head, and the body's lividity suggested a fall from a standing position or from a seated position on the bed and some sort of rotational acceleration against the floor.

According to Dr. Melinek, the first sign of a subdural hemorrhage is usually a headache. The person becomes more confused or lethargic, may become drowsy and collapse, and, if asleep, may not wake up. Death can occur from two to 48 hours later. When it occurs sooner, there are usually injuries such as a skull fracture and brain contusion. She estimated Atchison died at 3:30 a.m., plus or minus a few hours, based on the temperature measurements at the scene and photos of the body showing signs that it was face down for less than eight hours.[8]

Dr. Melinek also opined that Atchison's cirrhosis of the liver could have contributed to her hemorrhage because a person with cirrhosis was generally susceptible to bleeding due to the reduction of blood clotting factors, resulting in more pronounced bruises from minor injuries and an increased tendency to develop subdural hemorrhaging. Also, the upper normal weight of Atchison's

---

[8] Dr. Melinek testified that the petechial hemorrhaging in the eyes could have occurred from forceful coughing or vomiting, heart failure, strangulation, or from lying face down in an awkward position.

brain suggested it was atrophic, perhaps from many years of excessive drinking. However, she could not say from slides taken of the brain that it was atrophied.

Dr. Melinek also said years of alcohol abuse could impair a person's coordination and balance, even when sober. Dr. Melinek considered this in assessing whether Atchison's subdural hemorrhage could have been from a fall. Also, the blood alcohol levels found in Atchison's body were associated with slurred speech, slow reaction time, unsteady balance, and vomiting. They possibly could have been higher when Atchison sustained the subdural hemorrhage because her kidneys and liver would have continued to function for a time.

Dr. Melinek disagreed with Dr. Hart that the toxicology report indicated there was no alcohol in the subdural blood because the technique used for testing alcohol in the documentation was only listed for the femoral blood and vitreous humor and there was no alcohol result listed for the subdural blood. Atchison would have been unconscious by the time her brain's subdural was filled with blood, and, therefore, she would have been unable to consume more alcohol.

Dr. Melinek was asked about hypothetical events that were consistent with Sibilio's testimony. She opined that the subdural hemorrhage resulted from Atchison getting up from the bed and falling. If it had been from the fighting, Atchison more likely would not have gotten up from bed, but it was possible the subdural hemorrhaging started during the fighting. Dr. Melinek would have listed the cause of death on the death certificate as undetermined.

## C. *Verdict, Sentence, and Appeal*

Sibilio was found not guilty of first-degree murder and guilty of second-degree murder, assault with force likely to produce great bodily injury (§ 245,

15

subd. (a)(4)), and domestic violence - injury to cohabitant resulting in a traumatic condition (§ 273.5).[9] The court found four of the five aggravating factors alleged to be true.

The court sentenced Sibilio to 15 years to life in state prison for murder and stayed any sentence for assault and domestic violence.

Sibilio filed a timely notice of appeal.

## II. DISCUSSION

### A. *The Jury's Question About Implied Malice*

#### 1. Relevant Proceedings Below

The court instructed the jury on murder using CALCRIM No. 520, including: "The defendant had *implied malice* if: [¶] 1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life."

The court added in the same instruction, "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes."

The jury began its deliberations on the afternoon of November 28, 2022. At about 10:15 a.m. the next morning, the court received a note from it that reads, "Can you clarify the definition of what 'dangerous to human life' is? Does it include great bodily injury or does it imply death only?" It states on a separate line, "Pg. 33. Implied malice #3."

_____

[9] The parties do not explain how these other charges were added after the filing of the first amended information, nor does Sibilio challenge them.

16

At a hearing with counsel to determine how to answer the jury's note, the court said it had had a lengthy off the record discussion with counsel and asked them for their suggested responses to the note. Defense counsel proposed: " 'An act is dangerous to human life if a reasonable person would know death is likely to happen as a result of the act if nothing unusual intervenes.' " Counsel explained this tracked the definition of "natural and probable" consequences that was also in the instruction. He proposed in the alternative that the court refer the jury to element number two of the instruction's definition of implied malice and to its definition of natural and probable consequence.

The prosecutor proposed the court respond pursuant to CALCRIM No. 200, which was also given to the jury. It instructs in relevant part, "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

The court, after noting the jury's focus was on "dangerous to human life," not "natural and probable consequences," said, "[T]he potential answer is, great bodily injury constitutes dangerous to human life if the great bodily injury in question . . . is dangerous to human life," but said this was unhelpful "circular reasoning." It read its proposed answer: " 'Number one, review all the elements of implied malice. . . . [¶] Number two, the words, "dangerous to human life" are to be applied using their ordinary, everyday meaning in the context of the elements of implied malice.' "

Defense counsel objected that "dangerous to human life" did not have an ordinary meaning; that "the natural and probable consequences portion of CALCRIM 520 . . . should be applied"; and "that the jury should be specifically told that great bodily injury is not sufficient or appropriate for purposes of acts which are dangerous to human life."

17

The court sent its proposed answer. At 3:18 p.m., it announced the jury had reached a verdict earlier that afternoon.

## 2. Legal Standards

Murder is committed with implied malice when "the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 152; §§ 187, subd. (a), 188, subd. (a)(2).) The court's instruction followed this law, and Sibilio does not argue it was incorrect. Rather, he contends the court's *response to the jury's question* was in error.

During jury deliberations "when the jury 'desire[s] to be informed on any point of law arising in the case . . . the information required must be given.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 97, quoting § 1138[10].) "However, '[w]here the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People v. Brooks*, at p. 97.) Although the court need not always elaborate on standard instructions, it has "a 'mandatory' duty to

_____

[10] Section 1138 states: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." Sibilio did not object below, and does not contend on appeal, that the court's written response to the jury's note violated section 1138's procedural requirements. (See *People v. Roldan* (2005) 35 Cal.4th 646, 729 [failure to object below waives claim under section 1138], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

18

clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) "This means that a trial court's response to a jury question can be erroneous even if it does not technically misstate the law." (*People v. Fleming* (2018) 27 Cal.App.5th 754, 766.) In other words, "a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide . . . whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

We review further instructions in response to a jury's inquiry for abuse of discretion. (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4; see *People v. Waidla* (2000) 22 Cal.4th 690, 745–746.)

### 3. The Court Did Not Err in Responding to the Jury's Question

Sibilio argues the jury's question indicates "it did not know what 'dangerous to human life' meant; did it mean merely 'great bodily injury,' or did it mean something else, 'a high degree of probability that it will result in death.'" The trial court's answer—instructing it to examine all the elements of implied malice and apply "dangerous to human life" using its "ordinary, everyday meaning" within the context of implied malice—"misdirected" the jury into thinking " 'dangerous to human life' was the functional equivalent of great bodily injury."

We disagree. The court's answer was reasonable under the circumstances. The record shows the trial court carefully considered the question and extensively discussed it with counsel before answering. And its answer did more than merely refer the jury to the instruction. It reminded the jury to examine all the elements of implied malice *and* apply the term "dangerous to human life" according to its ordinary, everyday meaning.

19

The court had already instructed the jury to consider an intentional act, the natural and probable consequences of which Sibilio knew were dangerous to human life. Sibilio's trial counsel acknowledged the clarifying value of this part of the instruction by recommending the court refer the jury specifically to it. That the court declined to do so does *not* mean the jury disregarded it, and Sibilio offers no reason for us to think the jury did. (See *People v. Thomas* (2023) 14 Cal.5th 327, 382 [jurors are presumed to be able to " 'correlate instructions' "].) Nor is there any indication the jury ignored another clarifying element of implied malice, i.e., that it determine if Sibilio acted with a conscious disregard of that *danger to human life*.

Sibilio also points to a post-trial revision of CALCRIM No. 520 as part of his contention that the court should have given a more extensive answer. The second element of implied malice in CALCRIM No. 520 now reads: "The natural and probable consequences of the [act] were dangerous to human life in that the [act] involved a high degree of probability that it would result in death." The revision might facilitate a jury's ready digestion of the necessary elements of murder, but it does not establish the trial court's answer was insufficient. (See *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111 [" 'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard"], citing *People v. Watson* (1981) 30 Cal.3d 290, 300; *People v. Knoller*, *supra*, 41 Cal.4th at p. 152 [acknowledging *Watson*'s holding].)

In short, Sibilio fails to establish the trial court abused its discretion or made any legal error in answering the jury's question.

### 4. Any Error Was Harmless

"A court's failure under Penal Code section 1138 to adequately answer a jury's question 'is subject to the prejudice standard of *People v. Watson*

[(1956)] 46 Cal.2d 818, 836,' i.e., whether the error resulted in a reasonable probability of a less favorable outcome. (*People v. Roberts* (1992) 2 Cal.4th 271, 326.)" (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1017.)[11]

There is overwhelming evidence that Sibilio attacked Atchison with great violence. Atchison's body had several dozen blunt force injuries on different planes all over her body. They include five different blunt force injuries to three different planes of her head so severe that they caused bleeding into her scalp, at least one of which led to her death. There were at least eight different injuries to Atchison's face, mouth, lip, tongue, and ears; numerous bruises on the left and right sides, and front and back, of her torso; bruising and abrasions on the front and back of both legs; bruises on both arms; and multiple injuries to Atchison's hands that were consistent with her defending herself. Also, the defense theory that Atchison died from a fall was belied by bruises on her left armpit and left earlobe area, which were protected from falls, and by defensive injuries to her hands.

There is other evidence as well. The wreckage of the living room further suggests Sibilio viciously attacked Atchison that night. Sibilio indicated in his own self-serving account of their fighting that he hit her repeatedly and threw her about the living room. The testimony of the upstairs neighbor indicates he entered the apartment angry (contrary to his own account), and that his entrance was followed by arguing and thumping sounds. Paramedic Stangland's testimony indicates Sibilio was evasive in his

---

[11] Sibilio argues the trial court's answer reduced the elements required by the jury to consider for second degree murder and, therefore, was federal constitutional error pursuant to *Chapman v. California* (1967) 386 U.S. 18, 24. But the court's duty to answer is governed by a state statute, section 1138, and Sibilio does not argue *its* violation requires application of the *Chapman* test. Regardless, we would reach the same conclusion that any error was harmless under the *Chapman* test.

21

account of what had occurred, which account itself was inconsistent with Stangland's observations of the injuries to Atchison's body, further suggesting Sibilio's guilt.

The testimony of friends, family, and neighbors of the couple's history further indicates Sibilio's capacity for physically attacking Atchison with a reckless disregard for her safety. Their testimony at least suggests, such as by their observation of bruises on Atchison regardless of her denials that Sibilio caused them, that Sibilio punched her in the face, body-slammed her, pulled out her hair, and bruised her time and again in different parts of her body.

Further, although not needed for our harmless error conclusion, Atchison's numerous text messages and voicemail in 2014—such as that Sibilio beat her "to a bloody pulp," bloodied and discolored her eye, "beat [her] up," caused her to lose hearing in one ear, and more—indicate he knowingly, repeatedly caused significant injuries to her. They indicate in particular that he repeatedly hit Atchison in the face. And the blood evidence found in the apartment indicates the violent nature of the couple's fighting the night before the paramedics found Atchison lying dead in the bedroom.

At trial, Sibilio tried to explain away Atchison's deadly injuries by minimizing his assault of her that night. He testified that they fought on only a few, brief occasions, during which she hit him and he only hit her a few times, that he did not punch her in the head, and that he acted to try to restrain *her attacks on him* as much as anything else. He described an almost rosy denouement scene where Atchison sought to staunch his bloody wounds and the two ultimately laid in bed together petting their cat and laughing over how "fucked up [he] was." This account is patently unbelievable in light of the evidence we have just discussed.

22

Sibilio also relies on Dr. Melinek's expert testimony. Read closely, her testimony is largely conjecture and fails to grapple with much of Dr. Hart's autopsy findings, or even parts of Dr. Melinek's own testimony. She opined that Atchison died from blunt force trauma to the head with a subdural hemorrhage and brain injury, which could have resulted from *either* someone striking her in the head with a hard object or from a late-night fall. She concluded it was more likely from a fall because Atchison was unlikely to get up from bed if she suffered subdural hemorrhaging from Sibilio's attacks.

But in forming her opinion, Dr. Melinek relied on Sibilio's fanciful account of what occurred that evening rather than the physical evidence of Atchison's many blunt force injuries on many different planes all over her body. Dr. Melinek asserted that injuries could have occurred on different planes of Atchison's body if Atchison had fallen face first and pointed to some of the injuries to Atchison's face and the blood found on the floor near the head, and she suggested Atchison could have tried to break her fall or hit a nearby nightstand. But there are several obvious flaws with her theory.

First, her theory fails to explain how a fall could have caused the *dozens* of injuries Atchison suffered over almost every part of her body and many different planes; even if in the course of a fall some injuries were caused to another plane of the body, it fails to contend with the great extent of these injuries. It also does not explain how Atchison's blood came to be on different items, including in the bathroom. Nor does Dr. Melinek's scenario account for the injuries to areas of Atchison's body that are not vulnerable to injury by fall, the injuries to Atchison's hands consistent with her defending herself, the lack of any injury to Atchison's nose, and the lack of any evidence that Atchison actually hit the nightstand on her way down. Dr. Melinek's contention that the injury to Atchison's lip must have occurred when she fell

because if she suffered it while standing blood would have stained her clothes ignores that Sibilio could have caused her these injuries while she was prone; Sibilio himself testified that he attacked her while they were on the floor and forced her onto the floor multiple times.

Also, as Dr. Hart *and* Dr. Melinek both acknowledged, a person suffering subdural hemorrhaging resulting in Duret's Syndrome might remain conscious for some hours. Dr. Melinek offers no real reason why Atchison could not have been conscious for some time after being fatally injured by Sibilio's attacks, enough time to collapse by her bed when her brain bleeding became critical.

Dr. Melinek also opined that Atchison's cirrhosis of the liver could have contributed to her brain hemorrhage. But Dr. Melinek offered this susceptibility only as a general characteristic of the disease. She did *not* point to any evidence suggesting the disease was a significant factor in Atchison's death or any of her injuries, nor did she challenge Dr. Hart's testimony that nothing in the autopsy results indicated Atchison was particularly susceptible to bleeding due to her cirrhosis of the liver.

Sibilio argues there is no evidence that he punched Atchison in the head, such as a skull fracture or, in his case, a swollen hand. Even if true (which we doubt in light of his fanciful testimony), it is of no real significance in light of the severity of her head injuries and the numerous injuries she suffered. He cites *People v. Cravens* (2012) 53 Cal.4th 500 for the proposition that, as the *Cravens* court noted regarding fistic assaults, " 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.' " (*Id.* at p. 508.) But *Cravens* made this observation in discussing a case involving a *single* blow to the

head.  (*Id.* at pp. 508–512.)  Sibilio ignores the evidence we have already described—the many, many injuries to Atchison's head, face, torso, arms, and legs.  This was a far cry from a fistfight involving a single blow.

Also, the jury asked its question within a few hours of beginning its deliberations, and returned a verdict a few hours after receiving the court's answer.  These circumstances do not indicate the jury was suffering from abject confusion or was engaged in a fractious debate about Sibilio's guilt, but suggest instead that it was merely seeking some clarification as it reviewed the case.  They do not suggest prejudicial error.  (See, e.g., *People v. Saddler* (1979) 24 Cal.3d 671, 683–684 [erroneous jury instruction was harmless in light of the circumstances of the robbery, the strength of the witness identification testimony, other instructions, and the jury's quick deliberations].)

The only reasonable explanation that can be drawn from the evidence is that Sibilio violently attacked Atchison for an extended period of time, striking her with such force as to consciously endanger her life while disregarding this danger.  Any error by the trial court was harmless under the state (or federal) standard for error.

## B. *Substantial Evidence of Second Degree Murder*

Sibilio next contends substantial evidence does not support his murder conviction because nothing shows he knowingly endangered Atchison's life.  Once more, we disagree.

In assessing his claim, we " ' " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find appellant guilty beyond a reasonable doubt." ' " ' "  (*People v. Parker* (2022) 13 Cal.5th 1, 58.)

25

Again, Sibilio does not deny that he fought with Atchison but instead seeks to minimize his actions. He repeats many of the contentions we found unpersuasive in concluding that any instructional error was harmless. We incorporate and rely on that analysis here.

Sibilio points to some other evidence as well. He improperly compares, based on evidence not contained in the record, Atchison's purported size (five feet, five inches tall and 177 pounds) to his own. Regardless, there was substantial evidence that he repeatedly injured Atchison.

Second, Sibilio claims he had no reason to suspect he was endangering Atchison's life, contending Atchison was not necessarily intoxicated when she suffered a subdural hemorrhage in light of Dr. Hart's testimony about the lack of blood alcohol in her subdural blood,[12] which, he argues, suggests he testified truthfully that she was alert and talking after their fight. This not only relies on his own questionable testimony, but is of little significance in light of Atchison's extensive injuries and the evidence that her subdural hemorrhaging and death could have occurred over some hours.

Sibilio also contends his actions the next morning—he sought out others, called 911, and tried to revive Atchison—were inconsistent with those of a murderer. This too is of no real significance in light of the evidence we have summarized. That he may have woken up the next morning in a more sober state and realized the trouble he was in if Atchison died (as seen by his admittedly self-serving statement to the paramedic, Stangland, that Atchison had attacked him) does little to explain the overwhelming evidence that he murdered her. Moreover, the prosecution's domestic violence expert

_____

[12] Sibilio also asserts that Atchison was "probably . . . snorting cocaine" after they fought. The only evidence of cocaine was an unexplained, inactive metabolite of cocaine found in her subclavian blood. It does not support Sibilio's assertion of "probability."

explained that abusers often follow a pattern that includes feeling remorseful after physically abusing a victim.

In short, Sibilio's contentions ask us in effect to reweigh the evidence. But " '[t]he determinations should "be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists . . . ." ' " (*People v. Helzer* (2024) 15 Cal.5th 622, 646, quoting *In re Caden C.* (2021) 11 Cal.5th 614, 640.)  Sibilio's insufficient evidence argument is without merit.

## C. *The Suppression Motion*

Sibilio next argues the trial court prejudicially violated his state and federal constitutional rights against unreasonable searches and seizures when it denied his section 1538.5 motion to suppress 10 items of evidence and quash the two search warrants police relied on to obtain them (suppression motion).

Sibilio makes several arguments for prejudicial error, but we need not address all of them.  The trial court properly denied his suppression motion because (1) the August 26, 2014 warrant was based on information obtained in the course of entries into the apartment earlier that day that were justified by exigent circumstances and as part of an uninterrupted, minimally intrusive police presence; (2) the challenged evidence would have been inevitably discovered in the course of the proper seizure and examination of Atchison's body; (3) Sibilio has forfeited his claim regarding the plastic bag seized in the apartment house garage on August 29, 2014 by failing to raise it below; and (4) even assuming error, it was harmless beyond a reasonable doubt.

## 1. Relevant Proceedings Below

### a. *The August 26 Warrant*

The August 26, 2014 warrant (August 26 warrant), obtained by San Francisco Police Sergeant Domenico Discenza, authorized the police to search the apartment for blood evidence, cell phones, and computers. Discenza declared in an accompanying statement of probable cause that, upon learning that morning of a suspicious death, he and two other police investigators went to the apartment house. Arriving at about 11:50 a.m., he spoke to Springer, who said Atchison was dead in the apartment's bedroom, and that Sibilio, the 911 caller, was Atchison's boyfriend or co-habitant, and unwilling to talk until his lawyer arrived.

Dr. Hart told Discenza the death seemed suspicious. A medical examiner investigator told Discenza that Atchison's body had blunt force trauma to the face and upper lip, injuries inside the mouth, and bruising to the abdomen, and that the paramedics said Sibilio told them he last saw Atchison at 11:00 p.m. the night before and found her not breathing that morning. Discenza further stated that, once in the apartment, he observed that the living room was "in disarray," with a "a book shelf knocked over," "items strewn about," and a damaged television screen, as if "there was some type of struggle"; "bruising" to the swollen abdomen and injuries to the face of Atchison's body; and a "cut" to the "forehead and nose" of Sibilio (who had been handcuffed and detained) that "appeared to be fresh" and "a reddish tint" where "the cuticle [met] the skin area" on his fingers.

### b. *The August 29 Warrant*

The August 29, 2014 warrant (August 29 warrant), also obtained by Discenza, authorized the police to search the apartment for additional items. Discenza repeated what he declared in his August 26 statement and stated additional information we need not summarize.

28

### c. *Sibilio's Suppression Motion*

Before trial, Sibilio moved to suppress the 10 items of evidence and quash the two search warrants.[13] The items he sought to exclude were cell phones belonging to Atchison and Sibilio; items appearing stained with blood seized from the apartment and the apartment house garage and the forensic testing of the items; clothing worn by Sibilio; photographs taken and observations by police and medical examiner personnel on August 26, 2014; suspected psychedelic mushrooms; and the contents of two computers.

The prosecution opposed the motion, and an evidentiary hearing followed.

### d. *Hearing Testimony of Lieutenant Springer*

Lieutenant Springer testified that she went to the apartment house on August 26, 2014, to investigate a reportedly suspicious death. Upon arriving at about 9:50 a.m., she spoke with paramedic Stangland outside the apartment. Stangland told him Atchison was dead inside. Stangland said Sibilio and Atchison were the only people in the apartment, and that Sibilio told him the two were drinking the night before, that Atchison was heavily intoxicated, that he remembered seeing her alive at around 11:00 p.m., and that he woke up in the morning to find her lying face down on the floor, dead. But Sibilio could not recall a lot of details and Atchison's body displayed several injuries, such as bruises to her abdomen and face, that were inconsistent with his account. Also, according to a previously written statement by Springer, Stangland said the apartment showed signs of a physical struggle.

---

[13] Almost four years earlier, in January 2019, Sibilio filed two similar motions. He briefly refers to them but does not indicate the court ruled on them, nor does he argue their merits. Therefore, we will not discuss them further.

After talking to Stangland, Springer walked up the stairs to Sibilio's apartment. The door was open, and she could see about 80 percent of the living room from outside. Sibilio was standing in the living room and the apartment was in some disarray. Sibilio did not invite Springer to enter and she did not ask his permission. She entered to detain him, make sure no one else was in the apartment, evacuate anyone there, and secure the scene.

Once in the apartment, Springer saw the living room was "in disarray with furniture knocked over," including a bookshelf and coffee table, and there was "broken glass on the floor along with some papers and garbage." Sibilio "looked very distraught." He had blood on his shirt and small lacerations on the bridge of his nose and his forehead. Springer thought that "some sort of a crime had been committed, whether it was an assault or a homicide."

Springer began detaining and removing Sibilio from the apartment, and Sibilio said he would not talk without his lawyer present. Sibilio retrieved his shoes while Springer retrieved his socks from the bedroom, as she did not want him near Atchison's body. She did not see Atchison's body, which she understood was lying on the floor on the other side of the bedroom, and she did not otherwise search the apartment. She placed Sibilio in the back of her patrol car at about 9:55 a.m., just as Officers Ng and Tillan arrived.

Springer, as the highest ranking officer present, supervised activities at the crime scene, including controlling the recording on a crime scene log of who was allowed into the apartment. She left the crime scene at approximately 1:10 p.m.

e. *Hearing Testimony of Officer Tillan*

San Francisco Police Department Officer Luis Tillan testified that he and Officer Ng arrived at the apartment house at about 10:04 a.m. to find

Sibilio in the back of Springer's patrol car. According to a statement he previously wrote of his actions that day, he, Ng, and Springer then entered Sibilio's apartment to investigate further. Starting at 10:05 a.m., he began keeping a log of those entering the crime scene. The log, reviewed at the hearing, indicated that Springer, three members of the homicide team, the medical examiner personnel, and seven other crime scene investigators and police entered the crime scene before a warrant was obtained.

   f. *Hearing Testimony of Dr. Hart*

  Dr. Hart testified that the medical examiner's office "investigates sudden, unexpected and violent deaths" as required by state law. The office was "staffed by peace officers . . . . So they are a type of law enforcement as am I." Its personnel first examines the body and, if they find something suspicious about the death, they wait for the police department's crime scene investigation unit and homicide unit "to perform their protocols," after which they return to the scene in order to remove and examine the body.

  Dr. Hart testified that she went to the apartment on August 26, 2014, to investigate Atchison's death. There, she observed Atchison's body without moving it and saw contusions and signs of trauma. Investigators accompanying her touched the body to check for rigor mortis (the stiffening of the body after death) and lividity (the settling of blood in the deceased body caused by gravity), both of which they found. The bedroom temperature was measured as 75.5 degrees and the body's temperature was also recorded. Dr. Hart found the circumstances of the death to be suspicious.

  Dr. Hart further testified that when the time of death might be near the time a decedent is found, it is helpful to record the body's and the room's temperature because the body temperature changes over time. Similarly, rigor mortis and lividity change over time, and are generally recorded "to help understand the circumstances surrounding the death." Rigor mortis can

31

occur in 90 minutes or over some hours, and lividity can first appear at highly variable times. Some observations that can be made soon after death about lividity, rigor mortis, and temperature are not available after a number of hours because of changes in the body over time.

g. *Hearing Testimony of Sergeant Discenza*

Sergeant Discenza, who was a homicide detective, testified that he arrived at the apartment house at about 11:00 or 11:10 a.m. on August 26, 2014. Springer, police officers, medical examiner personnel, and two other members of the homicide team were present. He spoke with a medical examiner investigator, who said Atchison's body, in a bedroom, had injuries to the inside of the mouth, blunt force trauma to the face and "upper left," and bruising to the abdomen. Dr. Hart said Atchison's death was suspicious.

Discenza entered Sibilio's apartment at about 11:50 a.m. or noon. He conducted a "walk-through" for a "few minutes," "more observing the deceased body and the general overview of the scene" without touching or moving anything or opening drawers, in order to "have an idea of what I would be . . . able to describe in my search warrant, the condition of the scene."[14] The living room looked like "a tornado went through it. There was a shelf knocked over. There was books all over the place. There . . . looked like there was biological material"—by which he meant blood—"on a TV and some of the walls. It . . . looked like somebody had just took everything and dumped it on the ground." Some blood was on a living room couch, on Atchison's body, and on Sibilio's jersey. He observed bruising on the abdomen of Atchison's body, which was swollen, and injuries to the face.

---

[14] He also testified, "I walked through the apartment just to see if there's any obvious forced entry or anything like that to help determine if there was maybe a burglary or somebody broke in or any other things that could have happened."

32

Discenza obtained a search warrant at 3:22 p.m. that afternoon and a second search warrant three days later, on August 29.

### h. *The Trial Court's Denial of Sibilio's Motion*

The trial court denied Sibilio's suppression motion. It ruled the warrantless entries of the paramedics, Springer, and the medical examiner personnel were lawful, and that Dr. Hart performed a non-law enforcement function under California statute to determine the cause of death. Also, the homicide inspectors could lawfully enter Sibilio's apartment for a brief time, without touching or seizing anything, in order to prepare a request for a warrant. It denied the motion regarding the August 29 seizure of the contents of a bag found in the garage that included items stained with Atchison's blood.

We have already summarized the evidence presented at trial, including the DNA evidence and Atchison's text messages and voicemails to Sibilio that were obtained from the evidence Sibilio sought to suppress.

### 2. Legal Standards

Section 1538.5, subdivision (a)(1), under which Sibilio brought his motion, provides that a defendant may move to suppress evidence obtained as a result of an unreasonable search or seizure. Section 1538.5 "provides a defendant the 'sole and exclusive' means before trial to suppress evidence obtained as a result of a search or seizure." (*People v. Fayed* (2020) 9 Cal.5th 147, 182.) Both the federal and California Constitutions prohibit unreasonable searches and seizures by the government. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.) We review such state issues under federal constitutional standards. (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212.)

" 'The Fourth Amendment to the federal Constitution prohibits *unreasonable* searches and seizures.' [Citation.] ' "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' " [Citation.] . . .

"[R]easonableness generally requires the obtaining of a judicial warrant." ' [Citations.] 'In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.' [Citation.] The burden is on the People to establish an exception applies." (*People v. Macabeo, supra,* 1 Cal.5th at pp. 1212–1213.) " 'It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.' " (*People v. Thompson* (2006) 38 Cal.4th 811, 817.) Further, there is no " 'murder scene exception' " to the warrant requirement. (*Thompson v. Louisiana* (1984) 469 U.S. 17, 21, citing *Mincey v. Arizona* (1978) 437 U.S. 385, 392, 395; *People v. Superior Court (Chapman)* (2012) 204 Cal.App.4th 1004, 1020 (*Chapman*).)

For a motion to suppress, " ' "[w]e review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." [Citation.] . . . [W]e consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364–365.)

### 3. Analysis

#### a. *Exigent Circumstances*

Without a warrant, police may enter a residence if exigent circumstances exist, and also as part of an uninterrupted, minimally intrusive police presence after an initial lawful entry. These exceptions to the warrant requirement justified all of the entries into and observations made in Sibilio's apartment, particularly those of Springer, the medical examiner personnel, and Discenza, which Discenza relied on in his August 26 statement of probable cause.

34

" ' " ' "[E]xigent circumstances" means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.' " ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 151.) " ' "[T]he reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a [person] of reasonable caution in the belief that the action taken was appropriate." ' " (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1043.) " '[E]ntry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by . . . factors such as the imminent destruction of evidence or the need to prevent a suspect's escape.' " (*People v. Thompson*, *supra*, 38 Cal.4th at p. 818.)

"Probable cause ' "means less than evidence which would justify condemnation. . . . It [describes] circumstances which warrant suspicion." ' [Citations.] Probable cause . . . may be shown by evidence that would not be competent at trial. [Citation.] Accordingly, information and belief alone may support the issuance of search warrants, which require probable cause." (*Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 573–574.)

Exigent circumstances justified the entries of both Springer and the medical examiner personnel. Springer responded to a call of a suspicious death and, while outside the apartment, learned from paramedic Stangland that Atchison was dead inside after, by Sibilio's own account, a night of their drinking; that Sibilio was the only other person present in the apartment; and that the apartment showed signs of physical struggle. Also, Stangland said Atchison's body displayed several injuries that were inconsistent with Sibilio's limited account of what had occurred. Springer also testified that from outside the apartment, she could see through the open door that

35

Springer was standing in a living room that was in some disarray. She then entered the apartment to, among other things, detain Sibilio as a suspect in Atchison's death and secure the scene. She observed fresh injuries to Sibilio's face and blood on his t-shirt.

Sibilio argues Springer did not have an exigent need to enter the apartment because Atchison was dead and her body located, and Springer had no information that Sibilio was suicidal or possessed a weapon, no reasonable suspicion that he was dangerous, and could from outside the apartment see him and determine if he at any point was acting to destroy evidence, such as by going to the bedroom. These arguments are unpersuasive. Certainly, Springer had probable cause—from what Stangland told her outside the apartment, she had good reason to suspect Sibilio had violently killed Atchison and was not fully cooperative, given his evasive and possibly false answers to Stangland. These gave Springer probable cause to believe Sibilio was violent, dangerous, and could attempt to cover his tracks or worse. They provided Springer probable cause to immediately enter the apartment and detain him so as to, for example, prevent any efforts by him to escape, destroy evidence, or harm others or himself. (See *People v. Ovieda*, *supra*, 7 Cal.5th at p. 1051 [" '[W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises' "], quoting *People v. Mincey*, *supra*, 437 U.S. at p. 392.)

Importantly, Springer limited her activities upon first entering the apartment to detaining Sibilio without searching for anything other than Sibilio's socks as part of removing him to her patrol car. And what she learned and what she observed in the apartment that was in plain view—in particular, the wrecked living room, blood on Sibilio's shirt, and fresh injuries

36

to his face— gave her probable cause to reenter the apartment upon securing him in her patrol car.

Similarly, Dr. Hart and the medical examiner investigators went to the apartment to investigate a reported death.[15] Discenza's August 26 statement of probable cause and Dr. Hart's hearing testimony indicate they observed Atchison's body, which was in plain view, touched it to determine if rigor mortis and lividity were present, and measured its temperature as compared to the room temperature, all as part of an investigation into the circumstances of Atchison's death. Sibilio argues the People failed to show there was an exigency requiring that they take these actions because Dr. Hart's testimony was too qualified and vague about the timing and impact of changes in a deceased body over time and, therefore, did not establish the destruction of evidence was imminent.

Sibilio's argument ignores that the People needed only to show " ' "the existence of facts available [to the personnel] which would warrant a [person] of reasonable caution in the belief that the action taken was appropriate" ' " (*People v. Ovieda, supra*, 7 Cal.5th at p. 1043). In an analogous situation— the warrantless testing of the defendant's blood-alcohol level in his home— our Supreme Court, after an extensive review of case law in other jurisdictions, concluded the testing was justified by exigent circumstances in

---

[15] Sibilio acknowledges Government Code section 27491.2, subdivision (a) provides that the medical examiner's office, upon being informed of a suspicious death that falls within the classification of deaths requiring its inquiry, "may immediately proceed to where the body lies, examine the body, make identification, make inquiry into the circumstances, manner, and means of death and, as circumstances warrant, . . . order its removal for further investigation . . . ." He argues, however, that state law does not override the federal Constitution, one of the arguments we need not address.

large part because blood-alcohol evidence begins to diminish shortly after drinking stops, thereby threatening the imminent destruction of evidence. (*People v. Thompson*, *supra*, 38 Cal.4th at pp. 824–828[16].) Similarly, here the medical examiner personnel were confronted with indications that Atchison's death was suspicious and, in that context, conducted a limited examination of her body for signs regarding the timing and cause of death. As Dr. Hart testified, a body's telling characteristics could change with the passage of time, including in a matter of hours. In other words, there was an imminent danger that the culprit time would destroy evidence helpful in determining if a crime had occurred. These were exigent circumstances justifying their entry into the apartment and limited examination of Atchison's body under our governing "reasonableness" legal standard.

b. *Uninterrupted Police Presence*

There is a second, independent reason that justified the medical examiner team's warrantless activities, as well as Discenza's. Their activities were part of an uninterrupted, minimally intrusive police presence in Sibilio's apartment to gather evidence in plain view following Springer's own justified entry and activities. For this reason, these activities and the team's observations could be used to obtain the August 26 warrant.

When a lawful entry "is based upon exigent circumstances or consent, the law is clear that any incriminating evidence observed in plain view may be seized. . . . 'The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's

---

[16] The Ninth Circuit was critical of *Thompson* because it involved a misdemeanor offense (*Hopkins v. Bonvicino* (2009) 573 F.3d 752, 768–769, 772), but that has no bearing where, as here, a potential murder is involved.

privacy interest in that item is lost . . . .' " (*Chapman*, *supra*, 204 Cal.App.4th at pp. 1012–1013.)

"Generally, an independent justification is required for every warrantless entry by police, including those instances when the officers initially entered a residence lawfully but depart the premises and reenter later. [Citations.] [¶] But California decisions uphold an officer's reentry to seize evidence observed in plain view during a lawful entry but not seized initially because the officer was performing a duty that took priority over the seizure of evidence." (*Chapman*, *supra*, 204 Cal.App.4th at p. 1014.)

The *Chapman* court discussed instructive decisions: "[I]n *People v. McDowell* (1988) 46 Cal.3d 551, 564 (*McDowell*), an officer reentered a residence to retrieve evidence observed in plain view while pursuing a murder suspect. The court explained: '[The officer's] initial entry revealed evidence in plain view. His departure occurred before the items were seized because his first priority was the search for the suspect who was still at large. As he left, however, [he] secured the house by instructing another officer to assure that no one entered. "Thus his physical withdrawal from the [house] did not terminate what was in legal effect an uninterrupted police presence in [the residence] . . . ." [Citation.] We do not believe [the officer] relinquished his right to seize this evidence by giving more immediate priority to defendant's arrest. We therefore conclude that [his] actions, under the particular circumstances of this case, were reasonable.' ([Citation]; see also *People v. Amaya* (1979) 93 Cal.App.3d 424, 431 [the court upheld reentry of detectives to observe and collect evidence observed in plain view about two hours earlier by the first responding officer because there was effectively an uninterrupted police presence at the residence, the officer could have seized the evidence during the original entry, and it was not unreasonable for police

39

to wait a reasonable time for trained personnel before disturbing lawfully seizable evidence].)

"In *People v. Ngaue* (1992) 8 Cal.App.4th 896, 901–902, the court upheld a police reentry into a residence to retrieve a gun seen in plain view when arresting the occupant. The occupant promptly escaped from custody, and the arresting officer turned his attention to containing the area in order to apprehend him, but later called another officer and instructed him to return to the house to retrieve the gun. The appellate court held that the reentry was constitutionally valid under *McDowell* because 'there was no intent on the part of the officers to abandon the gun and retrieval of the gun took place without inexcusable delay.' (*Ngaue, supra*, at p. 905.)" (*Chapman, supra,* 204 Cal.App.4th at pp. 1014–1015; see also *People v. Justine* (1983) 140 Cal.App.3d 729 [regarding a drug possession for sale conviction, affirming denial of a suppression motion when police were initially allowed into a residence for other purposes and observed bullet holes and apparent drugs and paraphernalia in plain view, leading to their reentry soon thereafter, upon which a test showed a substance that was in plain view was cocaine].)

*Chapman* involved police who, without a warrant, entered a residence where a shooting reportedly had occurred to find a dead body; one of the officers secured the premises and remained with the body until the much later arrival of the coroner. (*Chapman, supra*, 204 Cal.App.4th at pp. 1007–1008.) In the hours that followed, numerous law enforcement personnel arrived and entered the residence, also without a warrant. (*Id*. at pp. 1008–1009.) Based on the cases it discussed, the *Chapman* court held that the "uninterrupted stream of second wave responders" entering the residence

40

was justified to process and seize evidence observed in plain view inside the residence. (*Id.* at p. 1016.)

Sibilio argues that none of the warrantless activities here were part of a justified uninterrupted police presence because the People failed to show any entry was justified by exigent circumstances. We disagree. The cases we have just discussed make clear the applicable law here. When a police officer lawfully enters a residence without a warrant due to exigent circumstances, other minimally intrusive entries, including by other officers, that follow soon thereafter to gather evidence in plain view are justified as part of an uninterrupted police presence. The entries and observations made by the medical examiner personnel and Discenza were part of such an uninterrupted police presence and gathering of evidence (meaning, the observations Discenza referred to in his statement of probable cause). As we have discussed, exigent circumstances justified Springer's initial entry into and observations of the apartment, and were soon followed by these further, limited investigations of the evidence in plain view. They were therefore justified as part of an uninterrupted police presence.

Springer did leave the apartment momentarily to secure Sibilio in her police car, but she did not abandon the scene. To the contrary, after securing him there, she immediately acted to secure the apartment and further investigate. She immediately returned with two other officers to the apartment and, as the senior officer, began supervising the securing of the scene, such as by Officer Tillan's maintenance of the crime scene log. And she remained at the scene for three more hours as the investigation continued without interruption. Moreover, everyone's investigation was limited to that which was in plain view, such as Atchison's body and the

41

wrecked living room.  Thus, Springer's momentary departure from the apartment was insignificant under the case law we have just discussed.

      c.  *Inevitable Discovery*

Our Supreme Court has explained:  " 'Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. . . . [T]he doctrine "is in reality an extrapolation from the independent source doctrine:  *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." (*Murray v. United States* (1988) 487 U.S. 533, 539.)' . . . [¶] The inevitable discovery rule 'applies only to evidence obtained as the indirect product, or fruit, of other evidence illegally seized.' [Citation.]  The prosecution must prove 'by a preponderance of the evidence that the information inevitably would have been discovered by lawful means.' " (*People v. Fayed*, *supra*, 9 Cal.5th at pp. 183–184.)

Sibilio argues the inevitable discovery rule does not apply here because, as he correctly points out, the existence of probable cause does not justify application of the inevitable discovery exception.  (*People v. Superior Court (Walker)* (2006) 143 Cal.App.4th 1183, 1215.)  We may not disregard a Fourth Amendment violation " 'simply because the police, had they thought about the situation more carefully*, could* have come up with a lawful means of achieving their desired results.' " (*Id*. at p. 1216, fn. 30; see also *People v. Robles* (2000) 23 Cal.4th 789, 800–801.)  This argument is unpersuasive because we have no doubt that, as the People argue, *independent* of any information obtained as a result of warrantless police entries into Sibilio's apartment, the court, whether on August 26 or soon thereafter, would have correctly found probable cause for at least the removal and autopsy of Atchison's body as a suspicious death.

42

Springer testified at the suppression hearing that she learned from paramedic Stangland that Atchison was dead inside after, by Sibilio's own account, a night of drinking with him; that Sibilio was the only other person present in the apartment; that the apartment showed signs of a physical struggle; and that Atchison's body displayed several injuries that were inconsistent with Sibilio's limited account of what had occurred.

This was more than enough probable cause for the court to at least issue a warrant authorizing the removal and examination of Atchison's body as a suspicious death. And once the body was autopsied, the overwhelming evidence that her death was due to blunt force trauma and that she had endured a tremendous beating would have been found, which in turn would have led to the inevitable discovery of all the challenged evidence.

We also do not agree with Sibilio that these circumstances fall outside the inevitable discovery doctrine because, assuming for the sake of argument that Discenza did not assert probable cause, he would have if he had thought more carefully about it. As we have already indicated, the chief medical examiner's office is authorized under Government Code section 27491.2, subdivision (a) to investigate suspicious deaths, which includes removal of a body for further examination. Under the circumstances, this inevitably, independent of the police investigation of which Discenza was a part, would have led to a court authorizing the lawful removal and autopsy of Atchison's body and resulted in the discovery of the challenged evidence.[17]

Our conclusion on inevitable discovery also defeats Sibilio's claim that Discenza's statement of probable cause supporting the August 26 warrant lacked probable cause regarding cell phones and computers, did not

---

[17] Notably, in his suppression motion, Sibilio did *not* argue the autopsy results should be suppressed.

particularly describe the items to be seized, and was overbroad in the absence of evidence of domestic violence. Once Atchison's body was inevitably seized and examined, the glaring signs of domestic abuse would have been obvious, and would have called out for an investigation into the couple's communications before Atchison's death. This in turn would have ultimately led to the seizure of all the evidence Sibilio challenges with this argument.

d. *Sibilio's Forfeiture of His August 29 Warrant Claim*

Sibilio argues the August 29 warrant did not authorize the police to seize from the apartment house garage a plastic bag containing items stained with Atchison's blood because the warrant authorized a search of the apartment only.

We need not address the merits of this strand of Sibilio's Fourth Amendment argument because, as the People argue, he has forfeited it by failing to first raise it in the court below. Our Supreme Court has instructed that, "when defendants move to suppress evidence, they must set forth the factual and legal bases for the motion . . . . Defendants who do not give the prosecution sufficient notice of . . . inadequacies cannot raise the issue on appeal." (*People v. Williams* (1999) 20 Cal.4th 119, 136.) Sibilio argued below only that the *type* of items (e.g., sheets and towels) seized from the bag were beyond the scope of the warrant and were not in the plain view of the police. He did not argue the bag itself was in a location, the garage, that was beyond the scope of the August 29 warrant. As a result, he has forfeited this claim.

e. *Harmless Error*

Even assuming for argument's sake that the trial court erred in denying Sibilio's suppression motion for any of the reasons he asserts, we would still affirm because any error was harmless beyond a reasonable doubt.

We evaluate an erroneous denial of a suppression motion brought for violation of the Fourth Amendment under the federal standard for prejudice, i.e., we affirm only if any error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24; *People v. Meza* (2018) 23 Cal.App.5th 604, 612, citing *People v. Neal* (2003) 31 Cal.4th 63, 86.)

In addressing the trial court's jury instructions above, we have already discussed that evidence admitted at trial showed overwhelming evidence of Sibilio's guilt, even if we exclude the evidence he sought to suppress (i.e., the blood evidence, Sibilio's clothing, Atchison's text messages and voicemails to him in 2014, and the observations of, and photographs taken by, police and medical examiner personnel on August 26), and exclude his testimony, which he contends he would not have given if this evidence was excluded. We will only briefly recap this overwhelming evidence.

At the heart of the prosecution's case were the autopsy results and related expert opinion of Dr. Hart regarding the condition of Atchison's body. This evidence—the 57 blunt force injuries on different planes all over Atchison's body, five of which were so severe as to cause bleeding into her brain, at least one of which led to her death, and which were inconsistent with a fall—points powerfully to Sibilio's guilt.

In addition, paramedic Stangland's and landlord Vail's testimony establish the apartment's living room was wrecked, indicating a major physical struggle had taken place there, which struggle was further indicated by Stangland's testimony that Sibilio had bloody injuries to his face. That it was Sibilio who initiated this violence was indicated by the upstairs neighbor's testimony that she heard him enter the apartment on the night in question angrily yelling at Atchison, followed by arguing and thumping sounds. Stangland also testified that Sibilio was evasive and self-serving in

45

his account of what had occurred, further suggesting his guilt. Also, the testimony about the couple's history indicates Sibilio's capacity for repeatedly physically attacking Atchison with a disregard for her safety.

From this evidence, only one reasonable conclusion can be drawn: that Sibilio murdered Atchison. Any error regarding Sibilio's suppression motion was harmless beyond a reasonable doubt.[18]

## III. DISPOSITION

The judgment is affirmed.

STREETER, Acting P. J.

I CONCUR:

CLAY, J.[*]

---

[18] Given our rejection of Sibilio's claims of error in Parts II.A and II.B. above, we need not address his claim that the cumulative effect of errors made below was prejudicial.

[*] Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

GOLDMAN, J., Concurring

I agree with most of the majority's analysis and concur in the result, but write separately about the trial court's response to the jury's question. The jurors wanted to know whether the phrase "dangerous to human life" "include[s] great bodily injury" or "impl[ies] death only." The meaning of their question seems straightforward: By contrasting "great bodily injury" with "death *only*," the jurors were asking whether great bodily injury that is *not* likely to result in death can nonetheless be considered "dangerous to human life." The answer to that question is also straightforward: No.

Defense counsel's proposed answer was accurate and would have told the jury directly that "dangerous to human life" does not include great bodily injury that is not likely to result in death. And the trial court's "potential answer"—that "great bodily injury constitutes dangerous to human life if the great bodily injury in question is . . . dangerous to human life"—could have avoided any "circular reasoning" by saying instead that "great bodily injury constitutes dangerous to human life if the bodily injury in question" is likely to result in death. By contrast, neither the prosecutor's proposed answer, nor the modified version of it the trial court ultimately gave, expressly told the jurors what they wanted to know. The better course, in my view, would have been to respond to the question with a direct answer.

Still, I am not persuaded by Sibilio's argument that the trial court's answer would have led the jury to believe that great bodily injury alone, without a likelihood of death as a consequence, qualifies as "dangerous to human life." The court's reference to the "ordinary, everyday meaning" of the words "dangerous to human life" would likely have been construed as an indirect way of saying that great bodily injury alone was insufficient, because "life" is generally understood as a condition contrasted with "death." For that

1

reason, the court's answer may have fallen within the range of permissible responses, and even if it amounted to an abuse of discretion, it was not prejudicial under the test in *People v. Watson* (1956) 46 Cal.2d 818, 836. The fact that the jury asked the question may indicate that one or more jurors were uncertain, at least at that point in their deliberations, that the evidence showed that Sibilio knew the great bodily injury he inflicted was likely to result in death. But I do not think it is reasonably probable that the court's answer left the jurors believing that a likelihood of death was not required, and thus that a direct answer to the question would have been reasonably probable to result in a verdict more favorable to Sibilio.

Lastly, I offer two comments in response to footnote 11 of the majority opinion. First, I would be cautious to avoid any implication that the fact that the trial court's duty to respond to juror questions is governed by a state statute means that an answer cannot give rise to federal constitutional error that would require application of the more demanding prejudice test in *Chapman v. California* (1967) 386 U.S. 18, 24. It is true that our Supreme Court has written that "[a]ny error under [Penal Code] section 1138 . . . is subject to the [*Watson*] prejudice standard," but it made that statement in the context of a potential "fail[ure] to answer the inquiry in the presence of or after notice to defendant's counsel or defendant himself." (*People v. Roberts* (1992) 2 Cal.4th 271, 326.) The court was not considering a situation in which the trial court is claimed to have discharged its state-law obligation to respond to the jury's question with an answer that violates the defendant's federal constitutional rights—in Sibilio's view, by "preclud[ing] the jury from making a finding on a factual issue that is necessary to establish the element of malice." (*People v. Schuller* (2023) 15 Cal.5th 237, 244.) I would leave it at this: Because the answer the court gave did not do so, Sibilio's invocation of

2

*Chapman* lacks merit.  Second, I do not join the majority's additional conclusion in footnote 11 that any error was harmless under that standard too.  Again, I think it is enough to say that it is not reasonably probable that the trial court's indirect response to the jury's question left the jurors under an impression that great bodily injury, without a likelihood of death, satisfied the definition of "dangerous to human life."